26 C.C.P.A. (Patents)

### GILMAN v. KLEIN et al.
### Patent Appeal No. 4002.

Court of Customs and Patent Appeals.
Feb. 6, 1939.

Hugh Keneipp, of Washington, D. C., Ralph N. Flint, of Detroit, Mich., and George B. Schley, of Indianapolis, Ind. (Blackmore, Spencer & Flint, of Detroit, Mich., of counsel), for appellant.

Whittemore, Hulbert & Belknap, of Detroit, Mich. (Clarence B. Zewadski, of Detroit, Mich., of counsel), for appellees.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

JACKSON, Associate Judge.

This is an appeal by Gilman, the junior party, from a decision of the Board of Appeals of the United States Patent Office which affirmed that of the Examiner of Interferences awarding priority of the involved invention to Klein and Sheehan, the senior parties.

The subject matter in controversy, in general, relates to a method of making bearings comprising a supporting outer steel shell to the inner surface of which a lining of bronze is inseparably united to make a bearing surface. The bearings are designed to be used in engines operated at high speeds, especially in airplanes and automobiles.

The Examiner of Interferences describes the process as follows: "* * *. These bearings may be made by axially centering a core of some nature within and spaced from the tubular outer steel shell so as to leave an annular space considerably larger than the desired thickness of the finished bearing surface between the shell and core, the bottom of the shell and core being sealed against entry of water in a suitable manner. The mold assembly thus formed is heated to a temperature above the melting point of the copper-lead bronze, and the molten bronze is then poured into the heated assembly in the space between the core and the steel shell. Immediately thereafter a suitable cooling medium is applied to the outer surface of the shell so that the assembly will be cooled very rapidly from the outside inwardly toward the center. In this manner the lining is united to the steel backing by fusion whereby a practically integral and single piece bearing is produced; and wherein the joint or bond between the shell and bronze lining is characterized by the alloying of the copper content of the bearing metal and the steel of the shell. This immediate and rapid cooling from the outside inwardly causes any segregation of lead or any other defects to occur inwardly near the core and away from the steel shell. After cooling the assembly is stripped of the core and bottom sealing means, and the shell and lining are machined to the required dimensions in the conventional manner."

The counts are:

"Count 1. The method of forming bearings comprising the casting of a copper lead compound having a lead content from 15% to 50% in a pre-heated steel shell and in immediately rapidly chilling the exterior surface of said shell.

"Count 2. The method of forming bearings comprising the casting of a copper lead compound having a lead content of between 15% and 50% in a steel shell preheated to a temperature from 1900 to 2000° F., the temperature of the molten metal when introduced into the shell being between 1850 and 1950° F., and in immediately rapidly chilling the exterior surface of the shell.

"Count 3. The process of making a bearing which consists in providing a mold having an outer annular ferrous metal part and a central core whereby an annular space is formed between the two; heating said mold to a temperature approximately that of the melting point of bronze; pouring molten bronze into the annular space aforesaid; cooling said mold and bronze rapidly and from the outside inwardly and toward the center thereof from the temperature immediately after pouring at which the bronze is liquid, to a temperature below that at which the bronze becomes solid; and finally finishing the outside of said outer part and the inside of said bronze bearing metal to the form and size of a finished bearing."

Counts 1 and 2 are from the application of Klein and Sheehan and count 3 from the Gilman application. The party Gilman filed a preliminary statement alleging conception and disclosure to others of the invention defined in the counts as of about

the middle of the year 1925 and reduction to practice in about January or February, 1926.

The parties, Klein and Sheehan took no testimony and. are limited to their filing date, December 14, 1931, for conception and constructive reduction to practice. Gilman filed his application in interference February 12, 1932, took testimony and made of record his prior copending application, Serial No. 360,899, filed May 6, 1929, as evidence of his constructive reduction to practice of the invention of the counts in issue.

It was held by both tribunals below that the prior Gilman application does not constitute constructive reduction to practice because it fails to disclose the invention defined by the counts.

The prior Gilman application sets forth its object as follows: "The object of my said invention is to provide a bearing and a method of making the same composed of metals which will provide a bearing of the necessary strength and rigidity and a bearing surface which will be of comparatively soft wearing quality but at the same time capable of resisting much higher temperature and withstanding much greater strain or 'pounding' in service than metals such as Babitt metal; and also one in which the metals are united by a bond that makes them practically integral and incapable of separation under flexing or any other strain."

As to the composition of the bearings, the said prior application states: "I have found by experience that a steel shell affords the 'best foundation for a bearing such as required for the purpose indicated for the reason that it may be of lighter weight for the same degree of strength than any other metal which I have found suitable for the purpose. I have also found that so-called 'plastic bronze' makes a most desirable metal for the lining or wearing surface for the bearing. By 'plastic bronze' I mean a composition composed of copper and lead the proportions of which may be varied to suit different conditions and different requirements, a suitable composition being thirty (30) parts of lead and seventy (70) parts of copper."

A method of forming the bearing according to the earlier of Gilman's application reads: "In Figure 2 I illustrate a method of forming the bearing which consists in mounting a cylinder D with a bottom d within the shell B and pouring the molten bronze from a ladle E into the space between the cylinder and the inner surface of the shell. It will be understood of course that the ends of the bearing are machined off appropriately after the bearing is finished. The bottom d of the cylinder D is large enough to cover the end of the shell B as clearly indicated."

The said prior application sets forth the steps of the method as follows:

"In the practice of the method by which these bearings are produced the steel shell of appropriate thickness is heated to a temperature which is approximately the temperature required for melting the bronze metal which is to be used to provide the bearing surface. The bronze metal is heated not only to the melting point but to approximately two hundred (200) degrees above its melting point and then is applied to the surface of the shell by the method heretofore described and illustrated in Figure 2 of the drawing or by any other method found appropriate. The bronze metal being in a fluid condition and the steel of a temperature substantially the same as that of such bronze metal the two metals fuse and unite firmly together forming a bond that makes the two metals practically integral and incapable of separation regardless of strain, flexing or other duty imposed in use.

"After the bronze metal is poured or otherwise applied to the steel shell it is allowed to cool for a short period sufficient to allow the two metals to fuse together but before the lead in the composition of the bronze can settle and separate from the copper by reason of its greater gravity the bearing is immersed in a cold bath and cooled quickly so that the copper and lead content of the bronze composition are held in the metal properly mixed and of the same relative proportions throughout."

The application further states: "While I have illustrated a bearing with the shell lined on its inner surface with the bronze it will be understood of course that its outside may be in a like manner covered with a bronze bearing surface or the bearing surface may be applied to both sides of the steel shell, depending upon the character of use for which the bearing is intended."

While the Board of Appeals agreed with the conclusion of the Examiner of Interferences in holding that the earlier application of Gilman did not constitute a dis-

closure of the invention defined in the counts, it considered, contrary to the holding of the Examiner of Interferences, that the copper-lead proportions fall within the ranges specified in the counts. The Board of Appeals also disagreed with the Examiner of Interferences in holding that the earlier application of Gilman did not disclose immediate chilling of the assembly after pouring.

The board said: "* * * . In view of the fact that designating the chilling of the mold in the Klein and Sheehan disclosure as 'immediately' after pouring involves the intermediate time of lowering the mold into the chilling chamber between the time of pouring and the time of chilling, and as the earlier Gilman application states that after pouring the molten bronze into the mold the chilling must take place before the lead in the composition of the bronze can settle and separate from the copper by reason of its greater gravity, we consider that this Gilman application discloses chilling immediately after the pouring within the contemplation of the requirements of the counts in issue as to this."

We agree with the board that Gilman did disclose, in his prior application, both lead and copper proportions and immediate chilling in conformity with the counts.

The process invention here, however, requires an additional essential step that is not disclosed in the earlier Gilman application and that step is the rapidly chilling or cooling of the shell or mold from the exterior surface. Appellant contends that this step does not mean that the chilling shall be "only" from the exterior surface. We cannot agree with this contention. Since the cooling process, as defined in the counts, consists in chilling the exterior surface of the shell and is from the outside inwardly, it is certainly clear that the cooling process can be of no other character.

It appears that chilling from the inside, or chilling from both the inside and outside does not produce the result sought, namely, a fusion between the copper content of the bronze and the steel shell. It will be observed that the prior application of Gilman states that the bronze metal and the steel are fused and that the bearing is immersed in a cold bath. The apparent purpose is, as stated in the application, to secure the two metals comprising the bronze, in the same relative proportion

throughout. This is not the result obtained by chilling from the outside only. Moreover, we note that Gilman specifies that a bearing may be produced by his process with a bronze bearing surface on both sides of the steel shell. This, we think, clearly indicates that by the use of the term "immersed," he intended it to mean cooled from both inside and outside.

We believe that the decisions of both tribunals below are correct in holding that the counts in issue are not readable upon the disclosure of the earlier application of Gilman and we so hold.

Appellant further contends that even though Gilman should not be given the date of his prior application for constructive reduction to practice, nevertheless, the said application proves that he was in possession of the invention when the earlier application was filed. This contention, we think, is answered by a reading of the application itself. It does not disclose the entire method of the counts in issue as above set forth, and it is our opinion that if he possessed the invention he would surely have shown it in his application.

The testimony and exhibits show that sample bronze-lined bearings were made by the Allison Engineering Company, of which the appellant was the president, general manager and chief engineer during January, 1926. The method followed in their production, however, was materially different than that of the counts, in that a precast bronze sleeve was inserted in the cold assembly and then the whole assembly was heated to about 1900° F.

A most careful examination of the record indicates to us, as it did to the tribunals below, that the only testimony on record that the first bearings produced by the Allison Company, by a method which satisfies the counts, was in 1927, is that of Gilman. His testimony, however, is not sufficiently corroborated. Exhibits 12 and 13 were placed in evidence for corroboration in this respect. Exhibit 12 consists of 6 blue prints, dated May 10, 1927 and depict cross-sections and details of an assembly which undoubtedly could be used with the process of the involved counts. Exhibit 13 consists of an order and a supplemental order from Ingersoll-Rand Company for bronze-lined wrist-pin boxes. These exhibits corroborate the testimony of Gilman that bronze-lined bearings were made for the Ingersoll-

Rand Company but we do not see how anyone could spell out a method or process from the exhibits.

It is true that Exhibit 12 shows a welded bottom to the assembly, but there is nothing to indicate as to when or how it was cooled.

There are many exhibits before us consisting of blue prints, orders for bearings, correspondence concerning orders, cost sheets, several samples of bronze-lined bearings and a mold or shell without the bronze lining. They have had our most careful consideration and while they all are evidence that the process defined in the counts could have been used, they are not of themselves sufficient to show that the said process was followed. To review the oral testimony would unduly lengthen this opinion and, we think, the facts are of no value to any other case. We have carefully considered the testimony of the witnesses who appeared on behalf of Gilman. Nowhere do we find a definite statement from any witness as to when the cooling process of the counts was either conceived or who conceived it or when it was put into practice.

It seems to us that if the process here involved had been conceived and reduced to practice prior to the filing date of the senior parties, December 14, 1931, Gilman having as witnesses all of the assistants who had to do with the production of the bearings produced by his company, should have easily by clear, definite testimony had his evidence corroborated.

The Examiner of Interferences, paraphrasing the language in the case of Bourn v. Hill, 27 App.D.C. 291, 296, summarized as follows: "A careful reading of the testimony fails to establish that Gilman had more than scratched the surface. All the circumstances surrounding the case, and his own conduct, tend to strengthen this opinion. He was president, general manager, and chief engineer of a company engaged in the manufacture of bearings, with ample means and facilities for making improvements in this art at his command, a patentee of improvements in bearings and had filed in 1929 an application heretofore referred to broadly disclosing a related process for making these bearings; and had full knowledge of the need for an improved process for the successful production of such bearings. It seems impossible that he would have waited three or four years after he had solved the problem, meanwhile filing application Ser. No. 360,899, before presenting an application for the improved and successful process. Bourn v. Hill, 123 O.G. 1284."

We believe that the Examiner of Interferences, in his said summary has correctly and properly set out cogent reasons for his holding that the junior party, Gilman, has not sustained his burden of proof. The Board of Appeals is in accord with the conclusion of the Examiner of Interferences in assigning to Gilman February 12, 1932, his filing date for conception and constructive reduction to practice, and we agree with this holding. Since this is subsequent to the filing date of Klein and Sheehan the decision of the Board of Appeals should be and is hereby affirmed.

Affirmed.